UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SCOTT LOMBARDO,

Plaintiff,

-v-

JOSEPH FREEBERN; MARK
SCHAARSCHMIDT; EDWIN GARCIA;
EUNICE ACERO; TINA RIVERA;
NADINE LEONTE; SUZANNE
GLADITSCH; CHRISTINA PETITO-
THORN; CHRISTIAN ANYENE; LISA
RODRIGUEZ; SHRAYAS BAXI;
SHONLONDA ROLLINS; MR. FLORES,

Defendants.

16-CV-7146 (KMK)

OPINION & ORDER

Appearances:

Scott Lombardo
New Hampton, NY
*Pro Se Plaintiff*

Gillian B. Lepore, Esq.
New York Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Pro se Plaintiff Scott Lombardo ("Plaintiff") filed the instant Complaint, pursuant to 42

U.S.C. § 1983, against Joseph Freebern, Executive Director of Mid-Hudson Forensic Psychiatric

Center ("Freebern"); Mark Schaarschmidt, Head Chaplain, Mid-Hudson Forensic Psychiatric

Center ("Schaarschmidt"); Edwin Garcia, Security Hospital Treatment Assistant ("SHTA"), Mid-

Hudson Forensic Psychiatric Center ("Garcia"); Eunice Acero, Head of the Kitchen, Mid-

Hudson Forensic Psychiatric Center ("Acero"); Tina Rivera, Head Cook and Supervisor, Mid-

Hudson Forensic Psychiatric Center ("Rivera"); Nadine Leonte, Social Worker, Mid-Hudson

Forensic Psychiatric Center ("Leonte"); Suzanne Gladitsch, New York State Office of Mental Health ("OMH") ("Gladitsch"); Christina Petito-Thorn, Supervisor SHTA, Mid-Hudson Forensic Psychiatric Center ("Petito-Thorn"); Christian Anyene, Social Worker, Mid-Hudson Forensic Psychiatric Center ("Anyene"); Lisa Rodriguez, Senior SHTA, Mid-Hudson Forensic Psychiatric Center ("Rodriguez"); Shrayas Baxi, Psychiatrist, Mid-Hudson Forensic Psychiatric Center ("Baxi"); Shonlonda Rollins, SHTA, Mid-Hudson Forensic Psychiatric Center ("Rollins"); Mr. Flores, Senior SHTA, Mid-Hudson Forensic Psychiatric Center ("Flores") (collectively, "Defendants"). (*See* Compl. (Dkt. No. 2).)[1] Plaintiff alleges that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, and New York State Mental Hygiene Law § 33.02, when they denied him grape juice for the Sabbath, access to various religious books and articles, and the right to attend one Passover service. (*See id.* at 1.)

---

[1] The Complaint sues all Defendants in their official and individual capacities. However, the Eleventh Amendment bars the claims asserted against State officials for damages in their official capacities. *See Kentucky v. Graham*, 473 U.S. 159, 169–70 (1985) (explaining that the Eleventh Amendment bars a damages action against State officials sued in their official capacity). Mid-Hudson forensic Psychiatric Center is operated by OMH, an agency of New York State. *Babcock v. New York State Office of Mental Health*, No. 04-CV-2261, 2009 WL 1598796, at *26 (S.D.N.Y. June 8, 2009) (stating that psychiatric facilities established within OMH are state agencies protected by the Eleventh Amendment); *Vallen v. Mid-Hudson Forensic Office of Mental Health*, No. 02-CV-5666, 2004 WL 1948756, at *3 (S.D.N.Y. Sept. 2, 2004) ("By statute the Mid–Hudson Forensic Psychiatric Center is a 'hospital' within the 'office' of the Commissioner of OMH. It is a state facility and entitled to the state's immunity."). Accordingly, employees of OMH facilities are state officials, and the claims against Defendants for damages in their official capacities are barred by the Eleventh Amendment. *See McNair v. Kirby Forensic Psychiatric Ctr.*, No. 09-CV-6660, 2010 WL 4446772, at *7 (S.D.N.Y. Nov. 5, 2010) ("The individual defendants, all of whom are employees of OMH, have been sued in both their official as well as individual capacities. Because the Eleventh Amendment bars claims against state employees sued in their official capacities, [the] plaintiff's claims against the individual defendants in their official capacities must be dismissed." (footnote omitted)).

Before the Court is Defendants' Motion To Dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), (the "Motion"). (*See* Notice of Mot. To Dismiss (Dkt. No. 37); Mem. of Law in Supp. of Defs.' Mot. To Dismiss ("Defs.' Mem.") (Dkt. No. 38).) For the following reasons, Defendants' Motion is granted.

I.  Background

A.  Factual Background

The following facts are taken from the Complaint and are accepted as true for the purposes of this Motion. At the time of the events described herein, Plaintiff was a patient at Mid-Hudson Forensic Psychiatric Center ("MHFPC"), (*see* Compl. 1), "a secure New York State facility that provides comprehensive evaluation, treatment, and rehabilitation, pursuant to court order, for offenders who have been found not guilty by reason of mental defect or incompetent to stand trial." *Lombardo v. Holanchock*, No. 07-CV-8674, 2008 WL 2543573, at *1 (S.D.N.Y. June 25, 2008). Plaintiff is committed at MHFPC pursuant to New York Criminal Procedure Law ("CPL") § 330.20, which provides for commitment of an individual adjudicated "not responsible" for criminal conduct "by reason of mental disease or defect." N.Y. Crim. Proc. Law § 330.20. (*See* Compl. ¶ 11 (describing Plaintiff as a "CPL § 330.20 patient").)

Plaintiff allegedly arrived at MHFPC on January 4, 2001, and was placed on "ward 33/34." (Compl. ¶ 1.) Upon arrival, "[Plaintiff] spoke with Rabbi Joel Schwab, who is the Jewish Chaplain at MHFPC and with the treatment team . . . regarding preparations for fulfilling Plaintiff's religious needs." (*Id.*) These needs "included a space to pray privately, safe storage for [Plaintiff's] Tifillin and prayer shawl, access to [Plaintiff's] hard cover Tanach (bible) and

Siddur (prayer book), and grape juice which is provided by the kitchen on Friday and Saturday at lunch time to begin and end the Sabbath." (*Id.*)[2]

### 1. Access to Grape Juice

Around August 2014, "Plaintiff stopped receiving grape juice at lunch on Fridays and Saturdays." (*Id.* ¶ 2.) Instead, he received cranberry juice. (*Id.*) Plaintiff spoke to Rivera, who told him "that MHFPC switched food vendors." (*Id.* ¶ 3.) "Plaintiff said that cranberry juice wasn't a suitable substitute," and Rivera told him "to take what we have." (*Id.*) Plaintiff then spoke to Acero about the lack of grape juice, "but the results were the same as with . . . Rivera." (*Id.* ¶ 4.) On December 12, 2014, Plaintiff sent a letter to The Aleph Institute, "an organization that caters to and troubleshoots for Jews in [p]rison and the military," (*id.* ¶ 5 n.8), with "copies to Rabbi Schwab, Defendant Joseph Freebern, and the Mental Hygiene Legal Service," (*id.* ¶ 5). In the letter, Plaintiff wrote that his "facility switched food vendors to save money and conform to other facilities' menus within [OMH]," and his dietician told him "that due to budget constraints, [his] grape juice was being stopped." (Pl.'s Mem. Law in Opp. to Defs.' Mot. To. Dismiss ("Pl.'s Mem.") Ex. 2 ("Letter to Aleph Institute") (Dkt. No. 43).) According to Plaintiff, "[t]he grape juice still didn't come." (*Id.* ¶ 5.) On February 26, 2015, Plaintiff called OMH Customer Relations, a "troubleshooter organization sponsored by N.Y. State," (*id.* ¶ 6 n.9), "and left a message complaining about the grape juice situation," (*id.* ¶ 6). Plaintiff received a letter from Gladitsch, dated February 27, 2015, acknowledging Plaintiff's February 26, 2015 message, indicating she was "only forwarding Plaintiff's concern, and the response letter to MHFPC's Clinical Director." (*Id.* ¶ 7.) "On April 24, 2015, Plaintiff called the MHFPC in-house

---

[2] According to Plaintiff, "[t]hese are ritualistic materials for prayer. Tifillin has long leather straps." (Compl. ¶ 1 n.5.) The "Tifillin and prayer shawl are [used] daily," except on the Sabbath. (Compl. ¶ 12 n.14.)

complaint line and expressed that he was still not getting his grape juice for religious purposes."
(*Id.* ¶ 8.)  Plaintiff also alleges he "made three previous phone calls to the in-house complaint
line regarding the grape juice, but there was no response or positive results."  (*Id.* ¶ 8 n.11.)
However, "Plaintiff didn't log the time and dates of the three previous calls."  (*Id.*)  On May 1,
2015, Elizabeth Massey, a social worker, interviewed Plaintiff about "the status of the grape
juice."  (*Id.* ¶ 9.)  On the evening of April 24 and April 25, 2015, Plaintiff had received grape
juice, but for other Sabbaths before and up until the date of writing the Complaint "there ha[d]
been times when no grape juice or even cranberry juice was given to him."  (*Id.*)  Plaintiff
received a letter from Jane McDonald, the "Director of Risk [M]anagement," dated May 20,
2015, "stating that he was satisfied with the action taken."[3]  (*Id.* ¶ 10.)

### 2.  Access to Religious Items

"On October 22, 2015, Plaintiff was transferred from 'ward 33/34' to 'ward 31/32'
because of alleged threats."  (*Id.* ¶ 11.)[4]  According to Plaintiff "[w]ard 31/32 is primarily a CPL
§[ ]730 ward, and besides one other patient, Plaintiff [was] the only CPL[ ]§ 330.20 patient on
ward 31/32."[5]  (*Id.*)  "On Saturday, October 24, 2015 . . . Thorn saw Plaintiff reading his Tanach,
which is a hard covered book, and ordered SHTA staff to confiscate Plaintiff's Tanach and two
Siddurs, all of which are hard covered, and [his] Tifillin and prayer shawl."  (*Id.* ¶ 12.)  "Thorn

---

[3] The "he" in this sentence presumably refers to Plaintiff, and the Court presumes the
"action" referred to is the provision of grape juice beginning April 24, 2015.  (Compl. ¶ 10; Pl.'s
Mem. 5.)

[4] Plaintiff notes that "[t]he reason for alleged threats and transfer to ward 31/32 is beyond
this legal action."  (*Id.* ¶ 11 n.13.)

[5] According to Defendants, MHFPC provides treatment both for "individuals retained
under [CPL] § 730 for restoration of fitness to stand trial on criminal charges, and for individuals
retained under CPL § 330.20 who were adjudged not responsible by reason of mental disease or
defect and found to have a dangerous mental disorder."  (Defs.' Mem. 1.)

didn't give Plaintiff options as to when or where" he could access the religious articles. (*Id.*)
Plaintiff met with the "31/32 treatment team" on October 27, 2015, and Ken Miller, "[t]he
treatment team leader . . . said the decision to obtain [Plaintiff's] religious items [was] up to the
33/34 treatment team to decide." (*Id.* ¶ 13.) Plaintiff met with the "33/34 treatment team" on
October 28, 2015, and "Plaintiff asked if he could have possession of his religious books." (*Id.*
¶ 14.) Dr. Baxi told Plaintiff "to ask the Senior SHTA" to which Plaintiff responded that "the
Senior SHTA said he ha[d] to speak with the 33/34 treatment team." (*Id.*) "On October 30,
2015, Plaintiff was visited by Rabbi Joel Schwab, who gave [P]aintiff a soft-covered prayer book
which is used in the MHFPC Jewish Services." (*Id.* ¶ 15.) Plaintiff alleges that "[t]he book is
very basic and is missing prayers that Plaintiff is accustomed to saying." (*Id.*) Rabbi Schwab
told Plaintiff that he spoke to "Freebern about Plaintiff having access to his Tifillin." (*Id.*) "On
November 3, 2015, Zelma Armstrong [("Armstrong")], who is the ward 33/34 Treatment Team
Leader ("TTL"), interviewed Plaintiff regarding the particulars as to time and place that he
should have access to his Tifillin and prayer shawl." (*Id.* ¶ 16.)

Plaintiff was transferred back to ward 33/34 on November 9, 2015. (*Id.* ¶ 18.) Plaintiff
asked Armstrong if he could get his Tanach and Siddurs back on November 12, 2015. (*Id.* ¶ 19.)
She responded "that ward 33/34 was transitioning, and that hard covered books would be
contraband." (*Id.*) "Armstrong gave Plaintiff permission to go to Jewish Services," (*id.*), which
he had missed "on October 23, October 30, and November 6, 2015," (*id.* ¶ 19 n.17.) On
November 16, 2015, Plaintiff again "asked the treatment team when he could get his Tifillin,
Siddurs, and Tanach back," but Dr. Baxi told Plaintiff that he "ha[d] to get off Close Observation
status first." (*Id.* ¶ 20.) "On November 21, 2015, Plaintiff was taken off Close Observation
status," but "was denied his religious items back" and was told by an unknown team member

"he'd get one thing at a time."  (*Id.* ¶ 21.)  "On December 2, 2015, Plaintiff was able to keep [the] Tifillin and prayer shawl behind 'the desk,'" but "Plaintiff [was] still using the prayer book given to him by Rabbi Schwab on October 30[, 2015]."  (*Id.* ¶ 23.)  Plaintiff alleges "[h]owever, up to this point since Tififf is approved, Plaintiff [did not have] access to it because a senior SHTA wasn't available."  (*Id.*)  On December 11, 2015, Armstrong brought "a manila envelope with Plaintiff's Tifillin and prayer shawl onto the ward, which was kept in a cabinet behind the SHTA desk."  (*Id.* ¶ 25.)  Plaintiff alleges he had been without these articles since October 24, 2014, for a total of 48 days.  (*Id.*)

"On February 15, 2016, Plaintiff wrote a letter to Defendant Joseph Freebern regarding the religious books which were confiscated."  (*Id.* ¶ 26.)  Plaintiff's letter requested that the confiscated books be replaced with books without hard covers, and provided a list of the books he needed and the place where they could be purchased.  (Pl.'s Mem. Ex 3 ("Feb. 15, 2016 Freebern Letter").)  On February 23, 2016, Plaintiff met with the treatment team and discussed the February 15, 2016 letter he sent to Freebern.  (Compl. ¶ 27.)  The treatment team told Plaintiff that he would not have access to the religious books that were confiscated.  (*Id.*)  On April 1, 2016. Plaintiff told Freebern that he "still didn't get access to his religious books" and Freebern told Plaintiff "he'd take care of it."  (*Id.* ¶ 28.)  "On April 6, 2016, Senior SHTA Andrea Heinzel told Plaintiff that his religious books [were] safe in her office."  (*Id.* ¶ 29.)  In response to a request from Anyene, Plaintiff "typed a schedule of when he[] expect[ed] to use the religious books."  (*Id.* ¶ 30.)  On Friday, April 15, 2016, Plaintiff and Anyene discussed that Plaintiff would need the books 18 minutes before sundown to begin the Sabbath, which began at 7:20 p.m.  (*Id.* ¶ 31.)  Accordingly, at 7:00 p.m., Plaintiff requested his books, but he never received them.  (*Id.*)  Then, "[o]n [Saturday,] April 16, 2016 at 2:20 p.m., Senior SHTA Heinzel

brought Plaintiff's books to the ward, but said he couldn't access them until Monday, [April 18, 2016]." (*Id.* ¶ 32.) "On April 18, 2016, at 7:05 a.m., Plaintiff gained access to his daily Siddur." (*Id.* ¶ 33.) Plaintiff alleges he had no access to the Siddur from October 24, 2015 until April 18, 2016, for a total of 178 days. During this same period, "Plaintiff had no access to his Tanach on 43 occasions." (*Id.*)

### 3. Access to Rabbi Schwab

On November 6, 2015, Plaintiff received a visit from Rabbi Schwab while "Plaintiff was in the back of the room where therapy groups were held in building 45." (*Id.* ¶ 17.) "Leonte called Rabbi Schwab out to the hallway." Plaintiff observed them "talk[ing] for a moment" and "Rabbi Schwab left without seeing Plaintiff or any explanation." (*Id.*) Leonte told Plaintiff "[t]his is group time." (*Id.*)

### 4. Defective Hanukkah Menorah

Flores brought a Hanukkah menorah to the ward on December 8, 2015. (*Id.* ¶ 24.) Plaintiff contends that "[t]he first candle was supposed to be lit at 5:15 p.m. on Sunday, December 6[, 2015]." (*Id*.) According to Plaintiff "[t]he [m]enorah is the type that has a blue bulb that one must screw in every night." (*Id.*) The menorah had one missing bulb, and "two bulbs were burnt out." (*Id.*) Plaintiff suggests he was concerned whether "the [m]enorah was safe to use and safe to be brought in the ward." (Pl.'s Mem. 4.) Unlike previous years, where the [m]enorah "ran on batteries," this version had an "electric cord, which is dangerous." (*Id.* ¶ 4 n.4.) Plaintiff argues that Flores had a duty "to make sure that not only is the [m]enorah in properly working order, but also that it is safe for institutional use." (*Id.*) "Plaintiff called the MHFPC [i]n-[h]ouse complaint line, but no action was taken." (Compl. ¶ 24.)

<u>5.  Access to Religious Services</u>

"On November 24, 2015, Plaintiff asked the treatment team if he could go to the Thanksgiving service run by Reverend Hunt."  (*Id.* ¶ 22.)  Dr. Baxi informed Plaintiff that "he could get privileges after the holidays."  (*Id.*)

"[T]he MHFPC facility wide Passover Seder" was scheduled at 9:45 a.m. on Thursday, April 21, 2016.  (*Id.* ¶ 34.)  Plaintiff alleges that the Passover Seder "is the most important event of the Jewish Year."  (*Id.*)  According to Plaintiff, "Passover is the pinnacle of the reason Jews exist today."  (Pl.'s Mem. 3.)  That day, "Plaintiff was awake and dressed when the day shift came onto the ward."  (Compl. ¶ 35.)  "Shortly after 7:00 a.m., Plaintiff asked SHTA Michael Marlow if he could get a shave," explaining that that day "was the Seder and Plaintiff wanted to look presentable."  (*Id.* ¶ 36.)  Thursday and Sunday are designated shave days on ward 33/34, and shaves typically occur sometime after 10:00 a.m.  (*Id.* ¶¶ 35 & 36 n.23.)  "Marlow denied Plaintiff, stating that he can't supervise Plaintiff to shave."  (*Id.*)  Plaintiff then asked Garcia if he could shave at around 7:30 a.m., "explaining the situation with the Seder and that he asked SHTA Marlow earlier."  (*Id.* ¶ 37.)  Garcia told Plaintiff he couldn't "go against his coworker." (*Id.*)  "At 7:50 a.m., Plaintiff refused his medication until he shaved" and told the nurse "so that he c[ould] speak to the treatment team."  (*Id.* ¶ 38.)

"At 9:15 a.m., Plaintiff signed up for the Passover Seder and for a shave," intending to go to both activities.  (*Id.* ¶ 39 & n.25.)  Plaintiff alleges that "[a]t 9:22 a.m. . . . Armstrong came out to the dayroom and went behind the SHTA desk and announced the following: 1) let [Plaintiff] shave, 2) let [Plaintiff] take his medication, and 3) let [Plaintiff] go to the Seder."  (*Id.* ¶ 40.) "Armstrong stipulated that if Plaintiff didn't take his medication, then he'd be refused the Seder."  (*Id.*)  After Armstrong left, "Rollins announced that she doesn't take orders from the

TTL, but from her supervisor, who is . . . Rodriguez." (*Id.* ¶ 41.) "At 9:28 a.m. . . . Garcia said Plaintiff threatened him, and that Plaintiff was going to get an 'X.'" (*Id.* ¶ 42.) According to Plaintiff, "[a]n 'X' is a loss of privileges [from] of the current level [of privileges] that a person is on." (*Id.* ¶ 42 n.26.) "There are three levels of privileges[:] entry, silver, and gold levels." (*Id.*) Plaintiff was given his normal medication at around 9:35 a.m. (*Id.* ¶ 43.)

"At 9:43 a.m. SHTA James Wallace came to ward 33/34 to pick up the patients to transport them to the Seder." (*Id.* ¶ 44.) Rodriguez "closed and locked the door to the dayroom and stated that Plaintiff was too agitated to go to the Seder." (*Id.*) Later that afternoon, "Plaintiff spoke with . . . Freebern's secretary, explaining that Plaintiff was denied the facility wide Seder." (*Id.* ¶ 46.) Plaintiff also "explained that in addition to the Seder, he has his own private Seder every year at the time of the actual Seder," which was Friday, April 22, 2016 at 7:25 p.m. (*Id.*) Plaintiff told Freebern's secretary that he "always g[o]t supplies at the MHFPC Seder" to use at his Seder, "including a box of Matzoh, horse radish (bitter herbs), charoset (represents mortar for bricks), and celery." (*Id.*) "Plaintiff already had [some] supplies that he purchased from The Aleph Institute including kosher for Passover Matzoh, grape juice, macaroons, and gevilte fish." (*Id.*) Plaintiff does not know "if the secretary gave the message to . . . Freebern, but Plaintiff never got the supplies requested." (*Id.* ¶ 46 n.28.) Plaintiff also sent a letter to Freebern regarding "the Seder issue, but Plaintiff never got an answer." (*Id.* ¶ 47.)

"On Saturday, July 9, 2016, SHTA staff announced that the feast of 'Eid Ul Fitr' was being held in the dining room that morning," and Plaintiff inquired about going to the feast. (*Id.* ¶ 48.) "Plaintiff was told that it was by invitation only and that only Muslim patients were invited." (*Id.*) "Plaintiff didn't want to go to the feast, but only inquired if he could." (*Id.* ¶ 48 n.29.) Plaintiff also notes that "any patient can go to the Passover Seder, and some . . . who go

never attended a Jewish Service all year long." (*Id.*) On August 1, 2016, "Plaintiff sent a letter to . . . Freebern, with a copy to . . . Schaarschmidt . . . explaining the feasts (both Muslim and Jewish) and the Department of Corrections [("DOCS")] protocol," outlined in DOCS Directive 4202. (*Id.* ¶ 49.) At the time he wrote the Complaint, "Plaintiff ha[d]n't gotten a response from either [D]efendant." (*Id.*)

### 6. Plaintiff's Medication Increase

Plaintiff alleges that following the incident regarding his attendance of the Passover Service, "[a]t 9:45 a.m., Plaintiff was called into the Conference Room for a treatment team meeting" where Dr. Baxi announced that starting that evening "Plaintiff's medication will be increased by adding 5mg Zyprexa." (*Id.* ¶ 45.) Plaintiff alleges that "Dr. Baxi took Plaintiff to Orange County Supreme Court on November 15, 2015 for a Medication Over Objection hearing, which Dr. Baxi won." (Pl.'s Mem. 9.)[6] The course of medicine approved "included Lithium, which is a mood-stabilizer, valproic acid, Olanzapine (Zyprexa), which is an anti-psychotic, and Haldol, which is also an anti-psychotic." (*Id.*) Plaintiff alleges he "has never been diagnosed as psychotic." (*Id.*) Plaintiff also argues that he "told Dr. Baxi of the long term side-effect of diabetes" from Zyprexa, but "Dr. Baxi was using the medication as punishment and was being reckless in the dispensing of Zyprexa even with the knowledge of its side-effects." (*Id.*) Plaintiff was concerned about the "long-term side effects of Zyprexa" because "Plaintiff's father's side of the family all has diabetes." (*Id.* at 9 n.6.) Additionally, "Haldol when mixed with Lithium can cause irreversible brain damage." (*Id.* at 9 n.5.)

---

[6] The Court notes that the November 15, 2015 hearing Plaintiff describes in his Opposition was before the MHFPC Passover Seder, which was on April 21, 2016.

<u>7.  Plaintiff's Claims</u>

Plaintiff brings fifteen causes of action against thirteen defendants.  (Compl. 11–13.)[7] The First and Second Causes of Action involve Plaintiff's alleged lack of access to grape juice for the Sabbath, and include claims under the First and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Rivera, Acero, Gladitsch, and Freebern.  (*Id.* at 11.)  The Third, Fourth, Seventh, Eighth, and Ninth Causes of Action involve alleged denial of access to Plaintiff's religious books and articles, and include claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Thorn, Dr. Baxi, Freebern, and Anyene. (*Id.* at 11–12.)  The Fifth and Sixth Causes of Action involve Plaintiff's alleged lack of access to his spiritual advisor, and include claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Leonte.  (*Id.*)  The Tenth and Twelfth Causes of Action involve the alleged exclusion of Plaintiff from the Passover Seder, and include claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Rollins and Rodriguez.  (*Id.* at 12–13.)  The Tenth Cause of Action also involves the alleged denial of access to medication and shaving, and includes claims under the First, Eighth, and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Rollins.  (*Id.* at 12.)  The Eleventh Cause of Action involves Plaintiff's alleged receipt of an "X" and denial of privileges, and includes claims under the Eighth and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Garcia.  (*Id.*)  The Thirteenth Cause of Action involves the allegedly defective and untimely delivery of the Hanukkah menorah, and includes claims under the First, Eighth, and Fourteenth

_____

[7] The "Facts" section of the Complaint is organized in numbered paragraphs.  The "Causes of Action" and "Relief" sections do not follow the paragraph numbering from the Facts section.  The citations to these sections reference the page numbers printed on the bottom of the Complaint.

Amendments and Mental Hygiene Law § 33.02 against Flores. (*Id.* at 13.) The Fourteenth Cause of Action involves Plaintiff's alleged unjustified medication increase, and includes claims under the Eighth and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Dr. Baxi. (*Id.*) The Fifteenth Causes of Action involves the alleged violation of Plaintiff's right to practice religion, and includes claims under the First and Fourteenth Amendments and Mental Hygiene Law § 33.02 against Freebern and Schaarschmidt. (*Id.*)

Plaintiff requests compensatory damages of $276,000 and punitive damages of $13,000,000, or $1,000,000 per Defendant.[8] (*Id.* at 14.) Plaintiff also requests: (1) "an [i]njunction that all patients at MHFPC choose a religious service, and can't cross over to other services unless the service is an All-Faith service, or unless the patient appeals to the head chaplain to change faiths," in "accordance with DOCS Directive 4202;" (2) "an [i]njunction that if any patient is denied any religious service, that a full report [be issued] as to why and who authorized, and the justification of the denial of service;" (3) "an [i]njunction that if patients have special ritualistic religious items, such as Tifillin, etc. or books, regardless of hard-cover or soft-bound, that a safe place be made for articles and books, and access be granted as needed for said items;" and (4) "an [i]njunction that all special holiday items, such as Hanukkah [m]enorah or Christmas [t]ree, be inspected annually, or as needed per use, before and after each use, and that a replacement in good working condition be promptly made." (Compl. 13–14 & n.30.)

---

[8] Plaintiff breaks down the compensatory damages as follows: $8,000.00 for denial of grape juice for 8 months, $48,000.00 for denial of Tifillin and prayer shawl for 48 days; $43,000.00 for denial of Tanach for 43 days; $178,000.00 for denial of Siddur for 178 days. (Compl. 14.)

B.  Procedural Background

Plaintiff filed the instant Complaint on September 12, 2016.  (*See id.*)  That same day,

Plaintiff requested to proceed in forma pauperis, (Dkt. No. 1), which the Court granted on

November 29, 2016, (Dkt. No. 3).  On December 12, 2016, the Court issued an Order of Service

allowing Plaintiff to effect service on Defendants through the U.S. Marshals Service.  (Dkt. No.

5.)  On December 27, 2016, Plaintiff wrote the Court requesting the Order of Service include

Petito-Thorn.  (Dkt. No. 6.)  On December 30, 2016, the Court issued an Amended Order of

Service that included Petito-Thorn.  (Dkt. No. 7.)  On February 15, 2017, Plaintiff filed an

application for the Court to request pro bono counsel.  (Dkt. No. 20.)  The Court denied

Plaintiff's application without prejudice on March 9, 2017.  (Dkt. No. 25.)

The Court scheduled a Rule 16 conference on April 5, 2017.  (Dkt. No. 26.)  Defendants

requested adjournment of the conference, because they intended to file a letter requesting a

premotion conference for a proposed motion to dismiss.  (Dkt. No. 27.)  The Court granted the

request.  (Dkt. No. 29.)

On April 13, 2017, Defendants filed a letter seeking leave to file a Motion To Dismiss

and requesting premotion conference.  (Dkt. No. 31.)  On April 24, 2017, Plaintiff filed a letter in

opposition.  (Dkt. No. 33.)  The Court concluded that briefing on the Motion To Dismiss was

appropriate, and set a briefing schedule.  (Dkt. No. 34.)[9]

On June 6, 2017, Defendants filed their Motion To Dismiss and accompanying

Memorandum of Law.  (Dkt. No. 37; Defs.' Mem.)  On July 7, 2017, Plaintiff filed a

Memorandum of Law in Opposition to Defendants' Motion and accompanying exhibits.  (Pl.'s

---

[9] On May 24, 2017, Defendant sought a one-week extension to file the Motion.  (Dkt. No. 35.)  The Court granted the request.  (Dkt. No. 36.)

Mem.)[10]  On July 21, 2017, Defendants filed their Reply Memorandum of Law.  (Defs.' Reply Mem. of Law in Supp. of Mot. To. Dismiss ("Defs.' Reply Mem.") (Dkt. No. 46).)

## II.  Discussion

### A.  Standard of Review

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his [or her] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, alteration, and internal quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (alteration and internal quotation marks omitted).  Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the

---

[10] On June 23, 2017, Plaintiff sought an extension of time to file papers opposing the Motion.  (Dkt. No. 40.)  The Court granted the request.  (Dkt. No. 41.)

mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . ." (internal quotation marks omitted)); *Aegis Ins. Servs., Inc. v. 7 World Trade Co.*, 737 F.3d 166, 176 (2d Cir. 2013) ("In reviewing a dismissal pursuant to Rule 12(b)(6), we . . . accept all factual allegations in the complaint as true . . . ." (alteration and internal quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)).

Where, as here, a plaintiff proceeds pro se, the Court must "construe[] [his complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (internal quotation marks omitted); *see also Farzan v. Wells Fargo Bank, N.A.*, No. 12-CV-1217, 2013 WL 6231615, at *12 (S.D.N.Y. Dec. 2, 2013) (same), *aff'd sub nom. Farzan v. Genesis 10*, 619 F. App'x 15 (2d Cir. 2015). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (internal quotation marks omitted); *see also Caidor v. Onondaga County*, 517

F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and internal quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted). However, when the complaint is pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (internal quotation marks omitted), including, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted), statements by the plaintiff "submitted in response to [a] defendant's request for a pre-motion conference," *Jones v. Fed. Bureau of Prisons*, No. 11-CV-4733, 2013 WL 5300721, at *2 (E.D.N.Y. Sept. 19, 2013), and "documents that the plaintiff[] either possessed or knew about and upon which [he or she] relied in bringing the suit," *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

B. Analysis

1. New York State Mental Hygiene Law Claims

Defendants argue that Plaintiff's claims under New York State Mental Hygiene Law § 33.02 should be dismissed as there is no private right of action under the Mental Hygiene Law. (Defs.' Mem. 5–6.) Plaintiff appears to acknowledge as much, arguing only that the causes of action with Mental Hygiene Law claims also contain Constitutional claims. (Pl.'s Mem. 1.) The

Court agrees that Mental Hygiene Law § 33.02 does not confer a private right of action. "The Mental Hygiene Law is a regulatory statute." *McWilliams v. Catholic Diocese of Rochester,* 536 N.Y.S.2d 285, 286 (App. Div. 1988). "No private cause of action is authorized for violations of the Mental Hygiene Law." *Id.*; *see also Lombardo*, 2008 WL 2543573, at *10 (same); *Lombardo v. Stone*, No. 99-CV-4603, 2001 WL 940559, at *5 (S.D.N.Y. Aug. 20, 2001) (same). Thus, the Court dismisses the claims brought under Mental Hygiene Law § 33.02 in the Second, Fourth, Sixth, Eighth, Eleventh, Twelfth, Thirteenth, and Fifteenth Causes of Action.

### 2. First Amendment Free Exercise Claims

### a. Standard of Review

Defendants argue that the Complaint fails to state a Free Exercise claim under the First Amendment. (Defs.' Mem. 6–14.) The Free Exercise Clause of the First Amendment is an "unflinching pledge to allow our citizenry to explore . . . religious beliefs in accordance with the dictates of their conscience." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir. 1984). "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause," *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003), which includes the right to participate in religious services, *see Salahuddin v. Coughlin*, 993 F.2d 306, 308 (2d Cir. 1993).[11] A prisoner's First Amendment rights, however, are "[b]alanced against . . . the interests of prison officials charged with complex duties arising from the administration of the penal system." *Ford*, 352 F.3d at 588 (internal quotation marks omitted); *see also Weathers v. Rock*, No. 12-CV-1301, 2014 WL 4810309, at *4 (N.D.N.Y. Sept.

---

[11] "No party has suggested that the analysis for a free exercise claim by an involuntarily committed individual is different from the analysis applied to prisoners' free exercise claims. Accordingly, the free exercise analysis applied in the prison context will apply here." *Lombardo*, 2008 WL 2543573, at *6 n.6.

23, 2014) (explaining that the right of inmates to freely exercise a chosen religion "is not limitless, and may be subject to restrictions relating to legitimate penological concerns"). Accordingly, a prisoner's Free Exercise claims are "judged under a reasonableness test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Ford*, 352 F.3d at 588 (internal quotation marks omitted).

"To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs." *Washington v. Chaboty*, No. 09-CV-9199, 2015 WL 1439348, at *9 (S.D.N.Y. Mar. 30, 2015) (alteration and internal quotation marks omitted); *see also Salahuddin v. Goord*, 467 F.3d 263, 274–75 (2d Cir. 2006) ("The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs.").[12] In determining whether a belief is "sincere," "an individual . . . need only demonstrate that the beliefs professed are sincerely held and in the individual's own scheme of things, religious." *Ford*, 352 F.3d at 588 (alteration and internal quotation marks omitted). The relevant inquiry is not whether, as an objective matter, the belief is "accurate or logical." *Jolly v. Coughlin,* 76 F.3d 468, 476 (2d Cir. 1996).

A substantial burden exists "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *McEachin v. McGuinnis*, 357 F.3d 197, 202 n. 4

---

[12] The Second Circuit has acknowledged that "[i]t has not been decided in this Circuit whether, to state a claim under the First Amendment's Free Exercise Clause, a prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Holland v. Goord*, 758 F.3d 215, 220 (2d Cir. 2014) (internal quotation marks omitted). The Second Circuit chose not to confront this question—or rather, not to alter the previous assumption that the substantial burden test is a threshold question. *Id.* at 220–21. This Court has already chosen to follow the analysis in *Holland* and thus will proceed under the assumption that the substantial burden test is still valid. *See Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *4 n.5 (S.D.N.Y. Feb. 2, 2017).

(2d Cir. 2004) (alterations and internal quotation marks omitted); *see also Gilliam v. Baez*, No. 15-CV-6631, 2017 WL 476733, at *5 (S.D.N.Y. Feb. 2, 2017) (same). The Second Circuit has further specified that "[t]he relevant question in determining whether [the plaintiff's] religious beliefs were substantially burdened is whether participation in the [religious activity], in particular, is considered central or important to [the plaintiff's religious] practice." *Ford*, 352 F.3d at 593–94. Once the plaintiff satisfies this burden, the defendants then "bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct," although "the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (alterations and internal quotation marks omitted).

Defendants do not contest the sincerity of Plaintiff's religious beliefs. The Court, therefore, will assume for the purpose of resolving the instant Motion that Plaintiff's religious beliefs are sincerely held.

The Court turns, then, to whether Plaintiff has adequately alleged that his ability to exercise his religious beliefs was substantially burdened. Construing his submissions liberally, Plaintiff alleges five ways his Free Exercise of Judaism was burdened: (1) he was deprived of grape juice; (2) he was denied access to his religious books and items; (3) his conversation with Rabbi Schwab was interrupted; (4) the menorah was broken; and (5) he was unable to attend the Passover Seder. (*See generally* Compl.) As alleged, none of these state a claim for violation of the Free Exercise Clause.

### b. Denial of Grape Juice

Defendants argue that Plaintiff being provided cranberry instead of grape juice for his religious practices fails to state a claim against Rivera, Acero, Gladitsch, or Freebern for

violation of Plaintiff's Free Exercise rights. (Defs.' Mem. 11–12.)[13]  Even assuming Plaintiff has

made a threshold showing that the being provided cranberry juice instead of grape juice to begin

the Sabbath substantially burdened his sincerely held religious beliefs, (*see* Pl.'s Mem. 4–5),

Defendants have satisfied "the relatively limited burden of identifying the legitimate penological

interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 275.  To make this

determination, a Court must consider four factors the Supreme Court outlined in *Turner v.

Safley*, 482 U.S. 78 (1987):

> whether the challenged regulation or official action has a valid, rational connection to a
> legitimate governmental objective; whether prisoners have alternative means of
> exercising the burdened right; the impact on guards, inmates, and prison resources of
> accommodating the right; and the existence of alternative means of facilitating exercise
> of the right that have only a de minimis adverse effect on valid penological interests.

---

[13] Plaintiff's allegation that Gladitsch forwarded Plaintiff's concerns regarding the lack of
grape juice to the clinical director fails to allege Gladitsch's personal involvement and the claim
against her is dismissed.  *See Phillip v. Schriro*, No. 12-CV-8349, 2014 WL 4184816, at *5
(S.D.N.Y. Aug. 22, 2014) ("A supervisory official is not deemed to have been personally
involved solely by virtue of having received a letter or complaint from a prisoner and having
referred it to the appropriate department for investigation."); *Rush v. Fischer*, 923 F. Supp. 2d
545, 552 (S.D.N.Y. 2013) (concluding that the allegation that the defendants "received multiple
letters from [the plaintiff] and referred the matter to others . . . alone is insufficient to constitute
the[ir] personal involvement"), *aff'd sub nom Rush v. Canfield*, 649 F. App'x 70 (2d Cir. 2016);
*Rivera v. Fischer*, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("The general rule is that if an
official receives a letter from an inmate and passes it on to a subordinate for response or
investigation, the official will not be deemed personally involved with respect to the subject
matter of the letter."); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (concluding at
the summary judgment stage that the plaintiff's letters to the DOCCS Commissioner, one of
which he referred to a subordinate for decision and the other of which he responded to "by
informing [the plaintiff] that [the subordinate] had rendered a decision," were insufficient to
"demonstrate the requisite personal involvement" of the Commissioner).  This is because
supervisors "receive large numbers of letters from inmates and they delegate subordinates to
handle them.  If courts found personal involvement every time a supervisor forwarded a
complaint to a subordinate, the [personal involvement] requirement would lose all meaning."
*Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (citations and internal quotation
marks omitted).

*Holland*, 758 F.3d at 222–23 (internal quotation marks omitted).  The rule requiring a legitimate penological interest is equally applicable to individual actions of prison personnel as it is to generally-applied policies or regulations.  *See Salahuddin*, 467 F.3d at 274 n.4 ("An individualized decision to deny a prisoner the ability to engage in religious exercise is analyzed in the same way as a prison regulation denying such exercise.").

As Plaintiff himself alleges, Defendants stopped providing Plaintiff grape juice because the hospital switched food service vendors to save money and grape juice was no longer available.  (Compl. ¶ 3 ("Rivera . . . said that MHFPC switched food vendors.").)  The decision to switch food vendors was made "to save money and conform to other facilities' menus within [OMH]."  (Letter to Aleph Institute.)  More specifically, the decision to stop providing grape juice was "due to budget constraints."  (*Id.*)[14]  These are legitimate penological interests to no longer provide Plaintiff grape juice that satisfies the first and third *Turner* factors.  "[I]t is well established that [the state] has a legitimate interest in cost-effectively meeting the religious dietary needs of multiple inmate groups."  *Simmons v. Robinson*, No. 07-CV-7383, 2010 WL 5538412, at *10 (S.D.N.Y. Jan. 28, 2010), *adopted by*, 2011 WL 31066 (S.D.N.Y. Jan. 4, 2011); *Henry v. Schriro*, No. 10-CV-7573, 2011 WL 3370394, at *2 (S.D.N.Y. Aug. 2, 2011) ("[E]fficiently allocating a limited operating budget by minimizing unnecessary administrative costs is a legitimate penological goal.").  MHFPC's choice of food vendor and allocation of resources is entitled to substantial deference, even if Plaintiff himself doubts how much more grape juice costs than cranberry juice.  (Pl.'s Mem. 5.)  *See Ford*, 352 F.3d at 595 ("[T]he

---

[14] It is appropriate for the Court to consider these facts as they either are alleged in Plaintiff's Complaint or in "documents that [Plaintiff] attache[d] to his opposition papers," *Agu*, 2010 WL 5186839, at *4 n.6, and "consistent with the allegations in the complaint," *Alsaifullah*, 2013 WL 3972514, at *4 n.3.

Supreme Court in *Turner* . . . intended to accord prison officials a high level of deference."); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) ("We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them. The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." (citations omitted)).

The second factor—the availability of alternative means of exercising the right to free exercise of religion—also supports the provision of cranberry over grape juice. "As has already been made clear in *Turner*[, 482 U.S. 78], and *O'Lone* [*v. Estate of Shabazz*, 482 U.S. 342, 350 (1987)], 'the right' in question must be viewed sensibly and expansively." *Thornburgh v. Abbott*, 490 U.S. 401, 417 (1989). "Thus, the second factor is not to be narrowly construed as pertaining to particular practices, such as having . . . grape juice." *Henry*, 2011 WL 3370394, at *3. As the court in *Henry* found in denying a Free Exercise claim where the plaintiff was similarly denied grape juice for the Sabbath, and not even offered the substitute of cranberry juice, "Plaintiff . . . is generally free to practice Judaism," thus satisfying the second factor. *Id. See also O'Lone*, 482 U.S. at 352 (finding no constitutional violation where Muslim prisoners were prevented from attending some religious services in light of the fact that they "[were] not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations").

With regard to the fourth factor—and the existence of alternative means of facilitating exercise of the right that have only a de minimis adverse effect on valid penological interests—Plaintiff has not satisfied his burden to show "[t]he existence of obvious, easy alternatives" to provide Plaintiff grape juice. *Thornburgh*, 490 U.S. at 418. Plaintiff "fails to propose 'ready

alternatives' to [MHFPC] providing him with . . . grape juice," such as deliveries from his "family, friends, or his community," *Henry*, 2011 WL 3370394, at *3, but instead merely points out that the alternatives suggested in *Henry* would not work under his circumstances. (Pl.'s Mem. 5.)[15] Thus, MHFPC providing Plaintiff cranberry instead of "grape juice is reasonably related to the legitimate penological interest[s] of . . . efficiently allocating administrative costs." *Henry*, 2011 WL 3370394, at *3. Plaintiff has failed "to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (alterations and internal quotation marks omitted). Therefore, because Defendants have proffered an explanation as to why Plaintiff was denied access to grape juice, which Plaintiff has failed to rebut, the Court dismisses this claim. *See Henry*, 2011 WL 3370394, at *3.

### c. Denial of Access to Religious Items

Defendants argue that Plaintiff's claim against Thorn, Baxi, Freebern, and Anyene for violation of his Free Exercise rights by restricting his access to certain religious books and articles also should be dismissed. (Defs.' Mem 13.) Even assuming Plaintiff has made a threshold showing that lack of access to his Tifillin and prayer shawl for 48 days and his hard-cover Siddur for 178 days substantially burdened his sincerely held religious beliefs, (*see* Pl.'s Mem. 6–7), Defendants have satisfied "the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 275. Plaintiff has acknowledged that he was transferred wards after allegedly making threats, (Compl. ¶ 11 & n.13), and that as a result of that "alleged incident," (Pl.'s Mem. 6), he was placed on close

---

[15] While Plaintiff claims that his parents and grandmother live in Nevada, making delivery of grape juice from them problematic, (Pl.'s Mem. 5), he fails to explain why no other family member, friend, or community member could not deliver grape juice to him. Indeed, Plaintiff alleges he procured grape juice from The Aleph Institute for Passover. (Compl. ¶ 46.)

observation status and lost certain privileges, (Compl. ¶ 20).[16]  Specifically, he lost access to his

Tanach and Siddurs because they were hard-covered books, which were considered contraband

in the ward Plaintiff was transferred into.  (*Id.* ¶¶ 12, 19.)  MHFPC was also in the process of

transiting all wards away from hard-cover books, including Plaintiff's previous ward.  (*Id.* ¶ 19.)

While the circumstances surrounding Plaintiff's transfer are not articulated in much detail, the

Court concludes that legitimate penological interests of preserving Plaintiff's safety and the

safety of other staff and patients in the hospital justified Plaintiff's lack of access to the books

and articles.  "As a penological goal, prison security is beyond question legitimate, as prison

security is central to all other corrections goals."  *Henry*, 2011 WL 3370394, at *2 (internal

quotation marks omitted).  Additionally, Plaintiff was given a soft-covered prayer book to

replace his hard copy one.  (Compl. ¶ 15.)  While Plaintiff alleges that "[t]he book is very basic

and is missing prayers that Plaintiff is accustomed to saying," (*id.*), that Plaintiff would have

preferred a different book does not negate that Plaintiff was given an "alternative means of

exercising" his Jewish faith.  *Salahuddin*, 467 F.3d at 274; *see also Thornburgh*, 490 U.S. at 417

("'[T]he right' in question must be viewed sensibly and expansively.").  Plaintiff has failed to

demonstrate that "these articulated [security] concerns were irrational."  *Salahuddin*, 467 F.3d at

275 (alterations and internal quotation marks omitted).  Therefore, because Plaintiff's Complaint

makes clear that Defendants have proffered a valid explanation as to why Plaintiff was denied

access to the religious books and items, which Plaintiff has failed to rebut, the Court dismisses

this claim.

---

[16] Plaintiff has implied that he did not make the threats that led to his transfer.  (Compl. ¶ 11 & n.13.)  However, Plaintiff does not deny that these alleged threats were the reason given for his transfer and loss of privileges, nor does he allege any actionable motive for the transfer. Thus, the accuracy of the threats is of no consequence.

#### d.  Interruption of Plaintiff's Conversation with Rabbi Schwab

Defendants argue that Plaintiff has failed to allege that Leonte violated Plaintiff's Free Exercise rights by interrupting his conversation with Rabbi Schwartz.  (Defs.' Mem. 8.)  Indeed, Plaintiff has failed to plead that the interruption of a single conversation "substantially burden[ed] his sincerely held religious beliefs."  *Salahuddin*, 467 F.3d at 274–75.  For example, Plaintiff does not explain how the interruption put "substantial pressure" on him to "modify his behavior and to violate his beliefs."  *Holland*, 758 F.3d at 221.  The singular interruption was at best a de minimus burden on Plaintiff's Free Exercise rights, and fails to state a claim.  *See Leach v. New York City*, No. 12-CV-3809, 2013 WL 3984996, at *2 (S.D.N.Y. Aug. 2, 2013) ("[The plaintiff's] assertion that his request to speak with a Rabbi was ignored on only a single occasion constitutes a de minimis imposition." (italics omitted)); *see also McEachin v. McGuinnis*, 357 F.3d 197, 203 n.6 (2d Cir. 2004) ("There may be inconveniences so trivial that they are most properly ignored.").  Thus, the Court dismisses this claim.

#### e.  Broken Menorah

Defendants argue that Plaintiff has failed to state a First Amendment claim against Flores for his alleged delivery of a broken menorah to the ward.  (Defs.' Mem. 8–10.)  Plaintiff has failed to allege a substantial burden to his religious beliefs from having a menorah in the ward with broken or missing light bulbs.  Plaintiff does not explain how the state of the menorah put "substantial pressure" on him to "modify his behavior and to violate his beliefs."  *Holland*, 758 F.3d at 221.  Nor does Plaintiff allege that a properly functioning menorah "is considered central or important" to his religious practices.  *Ford*, 352 F.3d at 593–94.  As alleged, the broken menorah represents the type of "inconvenience[] so trivial that [it is] most properly ignored."  *McEachin*, 357 F.3d at 203 n.6.

Moreover, denials of Free Exercise rights that "were not intentional or malicious, but appear to at most be the result of negligence by prison officials" fail to state a claim under the First Amendment. *Tafari v. Annets*, No. 06-CV-11360, 2008 WL 2413995, at *16 (S.D.N.Y. June 12, 2008), *adopted by*, 2008 WL 4449372 (S.D.N.Y. Oct. 2, 2008), *aff'd sub nom.*, 363 F. App'x 80 (2d Cir. 2010); *see also Hamilton v. Countant*, No. 13-CV-669, 2016 WL 881126, at *4 (S.D.N.Y. Mar. 1, 2016) (holding that "damages claims based solely on the negligent infringement of a prisoner's right to religious freedom are not actionable under either the First Amendment or RLUIPA"); *Hawkins v. N.Y.S. Dep't of Corr. Servs.,* No. 07-CV-0405, 2008 WL 2019655, at *5 (N.D.N.Y. Mar. 10, 2008) ("One reason that [the plaintiff's] First and Fourteenth Amendment [religious freedom] claims fail is because he has not alleged facts plausibly suggesting anything other than *negligence* by [the d]efendants. . . . Negligence is not actionable under either the First or Fourteenth Amendment.") (citations omitted); *Odom v. Dixion,* No. 04-CV-889, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (granting summary judgment for the defendants where "[the p]laintiff submits nothing contradicting [the d]efendants' assertion that [the p]laintiff's temporary removal from the [kosher] program was nothing more than an administrative error. . . . It is settled that mere negligence on the part of prison officials is insufficient to establish liability under § 1983."); *Young v. Scully,* No. 91-CV-4332, 1993 WL 88144, at *7 (S.D.N.Y. Mar. 22, 1993) ("There is no evidence in the record that the alleged deprivation of [the p]laintiff's first amendment [religious] rights involved any degree of fault by [the] defendants. . . . Negligence alone will not carry a § 1983 action." (internal quotation marks omitted)). Plaintiff alleges Flores delivered the broken menorah, not that Flores broke the menorah or was somehow responsible for the fact that it was broken. At best, this constitutes

negligent conduct.  Because Plaintiff has not alleged any facts other than mere negligence regarding the menorah, the Court dismisses this claim.[17]

### f.  Denial of Attendance at the Passover Seder

Defendants argue that Plaintiff has failed to allege that Rodriguez and Rollins substantially burdened Plaintiff's religion by causing him to miss the Passover Seder.  (Defs.' Mem. 8–10.)[18]

Courts in the Second Circuit have routinely held that "missing one religious service does not constitute a substantial burden on an inmate's right to the free exercise of his religion."  *Gill v. DeFrank*, No. 98-CV-7851, 2000 WL 897152, at *1 (S.D.N.Y. July 6, 2000), *aff'd*, 8 Fed. App'x. 35 (2d Cir. 2001); *see also Smith v. Wildermuth*, No. 11-CV-0241, 2017 WL 1379368, at *5 (N.D.N.Y. Apr. 14, 2017) (noting that "courts in the Second Circuit have routinely held that missing one religious prayer or service does not constitute a substantial burden necessary to sustain a First Amendment infringement claim") (collecting cases); *Jones v. Malin*, No. 15-CV-5381, 2017 WL 985943, at *3 (S.D.N.Y. Mar. 13, 2017) (same); *Lopez v. Cipolini*, 136 F. Supp. 3d 570, 588 (S.D.N.Y. 2015) ("In the Second Circuit, courts have held that preclusion from attending two religious services is not, without more, a 'substantial burden' on a plaintiff's free

---

[17] Because Plaintiff has not alleged the broken menorah substantially burdened his religious beliefs, there is no reason MHFPC would have had a duty to fix or replace the broken menorah.  *See Washington*, 2015 WL 1439348, at *9 ("To be entitled to protection under the free exercise clause of the First Amendment, a prisoner must make a threshold showing that the disputed conduct substantially burdened his sincerely held religious beliefs.").

[18] Plaintiff's claim against Rollins should be dismissed because Plaintiff has not alleged that Rollins was involved in making the decision that Plaintiff would not attend Passover Seder. *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation."). Rather, Plaintiff has alleged that Rollins refused to let Plaintiff shave and allegedly denied him his medication.  (Compl. ¶¶ 38–41.)  Those claims are addressed below.

exercise of religion.").  However, Plaintiff has alleged "Passover is the pinnacle of the reason Jews exist today," akin to the "Super Bowl" of religious services.  (Pl.'s Mem. 3.)  Construing Plaintiff's submissions liberally and drawing all reasonable inferences from the factual allegations in Plaintiff's favor, the Court finds that Plaintiff has plausibly alleged that Passover was "central or important to" his faith such that missing even one service could constitute a substantial burden.  *Ford*, 352 F.3d at 593–94 (asserting that being denied a holiday meal would be considered a substantial burden on the plaintiff's religious beliefs if participation in the meal was considered central or important to his practice of religion); *Jones v. Annucci*, No. 16-CV-3516, 2018 WL 910594, at *15 (S.D.N.Y. Feb. 14, 2018) (finding "[the p]laintiff ha[d] plausibly alleged that Ghadir Khum and Muharram/Ashura were 'central or important to' his faith" and thus Plaintiff was substantially burdened by not attending associated events); *Lopez*, 136 F. Supp. 3d at 588 (noting that failure to attend two services was not a substantial burden where "[the p]laintiff does not allege that the specific services were 'central or important' to [her] faith").

Because Plaintiff has alleged at the "threshold that the disputed conduct substantially burdens his sincerely held religious beliefs," "[D]efendants [now] bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct." *Salahuddin*, 467 F.3d at 274–75.  Defendants have met that burden, as Plaintiff himself alleges that he was not allowed to attend the Passover Seder because Rodriguez felt Plaintiff was "too agitated" after Plaintiff had been demanding to shave, refused to take his medication, and received an "X" for allegedly threatening a staff member.  (Compl. ¶¶ 36–44.)  Preventing an agitated psychiatric patient from attending the Passover Seder has "a valid, rational connection to [the] legitimate governmental objective" of keeping Plaintiff, as well as other patients and staff, at the hospital safe.  *Holland*, 758 F.3d at 222 (internal quotation marks omitted); *see, e.g.*,

*Henry*, 2011 WL 3370394, at *2 ("As a penological goal, prison security is beyond question legitimate, as prison security is central to all other corrections goals." (internal quotation marks omitted)). Additionally, Plaintiff indicated he had an "alternative means of exercising the burdened right," *Holland*, 758 F.3d at 223, because Plaintiff alleged he conducted his own Passover Seder in his room the next day. (Compl. ¶ 46.) *Jones*, 2018 WL 910594, at *16 (noting that dismissal of the Plaintiff's free exercise claim "is reinforced by Plaintiff's allegations that he could have observed Ghadir Khum and Ashura on his own by purchasing halal foods from the commissary, but he lacked the funds to do so."). Therefore, because Defendants have proffered legitimate explanations as to why Plaintiff was denied access to the Passover Seder, which Plaintiff has failed to rebut, the Court dismisses this claim.

### g. Claim Regarding Who Could Attend the Eid ul-Fitr and Passover Feasts

Defendants argue that any claims against Freebern and Schaarschmidt regarding the Eid ul-Fitr Feast should be dismissed because Plaintiff has failed to allege that they were personally involved in the alleged Constitutional violations. (Defs.' Mem. 20–21.) "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). To establish personal involvement, a plaintiff must show that:

> (1) the defendant participated directly in the alleged constitutional violation[;] (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;] (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (alterations, italics, and internal quotation marks omitted).  In other words, "[b]ecause

vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

Government-official defendant, through the official's own individual actions, has violated the

Constitution."  *Iqbal*, 556 U.S. at 676.  Therefore, Plaintiff must plausibly allege conduct by

Freebern and Schaarschmidt that falls into one of the five categories identified above.  *See*

*Lebron v. Mrzyglod*, No. 14-CV-10290, 2017 WL 365493, at *4 (S.D.N.Y. Jan. 24, 2017)

(holding that the five categories "still control[] with respect to claims that do not require a

showing of discriminatory intent" post-*Iqbal*).

Plaintiff has failed to plausibly allege Freebern's and Schaarschmidt's personal

involvement in any alleged constitutional deprivation regarding the Eid ul-Fitr feast.  The

gravamen of the claims against Freebern and Schaarschmidt is that Plaintiff sent them a letter

"explaining the feasts and Department of Corrections protocol."  (Compl. ¶ 49.)  However, at the

time the Complaint was filed, "Plaintiff ha[d]n't gotten a response from either defendant."  (*Id.*)

The allegation that Freebern and Schaarschmidt received Plaintiff's letter complaining of

unconstitutional conduct, without more, does not plausibly allege that they were informed of the

violation through a report or appeal and failed to remedy the wrong.  *See Houston v. Schriro*, No.

11-CV-7374, 2014 WL 6694468, at *14 (S.D.N.Y. Nov. 26, 2014) ("[I]gnoring a prisoner's letter

or complaint is insufficient to render an official personally liable."); *Mateo v. Fischer*, 682 F.

Supp. 2d 423, 430 (S.D.N.Y. 2010) (holding that "[c]ourts in this circuit have said that the receipt

of letters or grievances, by itself, does not amount to personal involvement" and listing cases);

*Davis v. City of New York*, No. 00-CV-4309, 2000 WL 1877045, at *9 (S.D.N.Y. Dec. 27, 2000)

(finding no personal involvement where supervisory official ignored letter of protest and had no

other involvement in the alleged constitutional deprivation); *Pritchett v. Artuz*, No. 99-CV-3957,

2000 WL 4157, at *6 (S.D.N.Y. Jan. 3, 2000) (finding no personal involvement where a supervisory official ignored a prisoner's letter of complaint). Plaintiff does not allege that Freebern and Schaarschmidt knew of, were directly involved in, or somehow permitted any decisions regarding Plaintiff's attendance at the Eid ul-Fitr or Passover feasts. Plaintiff cannot merely assert that Freebern and Schaarschmidt were apprised of these alleged violations due to the letter. "This presumed knowledge, without more, is . . . insufficient to establish personal involvement." *Burgess v. Wright*, No. 08-CV-725, 2009 WL 2971538, at *6 (N.D.N.Y. Sept. 11, 2009); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (concluding that the defendant's receipt of a letter from a plaintiff generally complaining about the conditions of confinement was insufficient to put defendant "on actual or constructive notice of the violation"). Nor has Plaintiff plausibly alleged that Freebern and Schaarschmidt were "grossly negligent in supervising subordinates" or "exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring." *Grullon*, 720 F.3d at 139 (listing personal involvement categories).

Moreover, Freebern and Schaarschmidt cannot be held personally liable for constitutional violations by others at MHFPC merely "because [they] w[ere] in a high position of authority in [MHFPC]." *Wright*, 21 F.3d at 501 (affirming summary judgment in favor of the Commissioner of the New York Department of Correctional Services); *see also Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (explaining that "[a] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority" (internal quotation marks omitted)). "Supervisory status, without more, is not sufficient to subject a defendant to [§] 1983 liability." *Fortunato v. Bernstein*, No. 12-CV-1630, 2015 WL 5813376, at *6 (S.D.N.Y. Sept. 1, 2015) (internal quotation marks omitted).

Personal involvement requires "a showing of more than the linkage in the [MHFPC] chain of command." *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (same). The Court therefore dismisses this claim against Freebern and Schaarschmidt for lack of personal involvement.

### 3. RLUIPA Claims

Defendants seek dismissal of Plaintiff's allegations pursuant to RLUIPA because RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities and because Plaintiff has failed to satisfy the substantial burden requirement. (*See* Defs.' Mem. 8 n. 4, 9 n.6, 23.) Plaintiff does not allege a violation of RLUIPA in his Complaint, but states that "all of these"—presumably, all of the Free Exercise Claims— "fall under RLUIPA" in his Opposition to the Motion. (Pl.'s Mem. 4.) RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). "RLUIPA provides a more stringent standard than does the First Amendment, barring the government from imposing a substantial burden on a prisoner's free exercise unless the challenged conduct or regulation furthers a compelling governmental interest and is the least restrictive means of furthering that interest." *Holland*, 758 F.3d at 224 (alterations and internal quotation marks omitted); *see also Salahuddin*, 467 F.3d at 273 ("RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means." (quoting 42 U.S.C. § 2000cc-1(a)) (footnote omitted)). While "RLUIPA does not define 'substantial burden,' . . . the Second Circuit has assumed that '[s]ince substantial burden is a term

of art in the Supreme Court's free exercise jurisprudence[,] . . . Congress, by using it, planned to incorporate the cluster of ideas associated with the Court's use of it.'" *Panayoty v. Annucci*, 898 F. Supp. 2d 469, 481–82 (N.D.N.Y. 2012) (second alteration in original) (quoting *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007)), *adopted sub nom. Bonilla v. Annucci*, 2012 WL 4378127 (N.D.N.Y. Sept. 25, 2012). "The Supreme Court has held that a substantial burden is one that 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Id.* at 482 (alteration in original) (quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)). Whether a prisoner sufficiently pleads a substantial burden on a sincerely held religious belief under RLUIPA involves the same threshold analysis as under the First Amendment. *See Valdez v. City of New York*, No. 11-CV-5194, 2013 WL 8642169, at *12 (S.D.N.Y. Sept. 3, 2013) ("To state a claim under both the Free Exercise Clause of the First Amendment and RLUIPA, an inmate must first allege that the government imposed a 'substantial burden' on his religious exercise." (citing *Salahuddin,* 467 F.3d at 274–75)), *adopted by* 2014 WL 2767201 (S.D.N.Y. June 17, 2014); *Ramsey v. Goord*, 661 F. Supp. 2d 370, 395 n.12 (W.D.N.Y. 2009) (explaining that "the threshold inquiry of a religious freedom claim under both the First Amendment and . . . RLUIPA is the same"); *Pugh v. Goord*, 571 F. Supp. 2d 477, 504 (S.D.N.Y. 2008) (engaging in the same analysis for determining a plaintiff's sincerely held beliefs under both . . . RLUIPA and the Free Exercise Clause). "Where a plaintiff adduces evidence sufficient to show that the government practice substantially burdens [his or] her religious exercise, the onus shifts to the government to demonstrate that the practice furthers a compelling governmental interest, and that the burden imposed on religion is the least restrictive means of achieving that interest." *Jova v. Smith*, 582 F.3d 410, 415 (2d Cir. 2009) (per curiam) (citing 42 U.S.C. § 2000cc-2(b)).

"RLUIPA does not authorize claims for monetary damages against state officers in either their official or individual capacities." *Holland*, 758 F.3d at 224; *see also Keitt v. Hawk*, No. 13-CV-850, 2015 WL 1246058, at *11 (N.D.N.Y. Jan. 8, 2015) (same). Instead, a plaintiff may only seek injunctive relief. *See Holland*, 758 F.3d at 224; *see also Fortress Bible Church v. Feiner*, 734 F. Supp. 2d 409, 520 (S.D.N.Y. 2010) ("It is readily apparent that injunctive relief constitutes appropriate relief under RLUIPA." (internal quotation marks omitted)). Accordingly, Plaintiff's claims for money damages under RLUIPA are dismissed. *See Gilliam*, 2017 WL 476733, at *6–7 (dismissing claim for monetary damages under RLUIPA).[19]

### 4. Eighth and Fourteenth Amendment Claims

Defendants argue Plaintiff has failed to state an Eighth Amendment claim for cruel or unusual punishment because he was not a convicted prisoner. (Defs.' Mem. 6.) "[T]he Eighth Amendment applies only to 'punishment,' and as 'an insanity acquittee . . . was not convicted, he may not be punished.'" *Lombardo*, 2008 WL 2543573, at *9 (quoting *Jones v. United States*, 463 U.S. 354, 369 (1983)). However, "[i]ndividuals involuntarily committed to state custody, such as Plaintiff, have constitutionally-protected liberty interests in adequate food, shelter, clothing, medical care, and conditions of reasonable care and safety." *Vallen v. Plan*, No. 15-CV-0703, 2016 WL 482026, at *3 (E.D.N.Y. Feb. 4, 2016) (citing *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982)). "The rights of patients who are involuntarily committed have been likened to the rights of detainees awaiting trial." *James v. Morgan*, No. 13-CV-526, 2014 WL 841344, at *2 (N.D.N.Y. Mar. 4, 2014) (citing *Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009) (noting

---

[19] Plaintiff seeks various forms of injunctive relief regarding the Free Exercise violations he alleged, (*see* Compl. 13–14), however, as explained above, these claims are dismissed on the merits without prejudice and do not specifically allege claims under RLUIPA. Plaintiff is free to seek injunctive relief for claims based on the Constitution or RLUIPA in his Amended Complaint.

that an involuntarily committed person's Constitutional claim "should be evaluated under the . . . standard usually applied to . . . claims brought by pretrial detainees" (internal quotation marks omitted)); *Buthy v. Comm'r of Off. of Mental Health of N.Y.*, 818 F.2d 1046, 1051 (2d Cir. 1987) (applying the levels of protection afforded pre-trial detainees under the Due Process Clause to persons confined due to an acquittal by reason of insanity or their incompetence to stand trial); *Vallen*, 2016 WL 482026, at *3–4 (same). Accordingly, because Plaintiff was involuntarily committed at the time of the challenged conduct, the Court analyzes his deliberate indifference claims under the Due Process Clause of the Fourteenth Amendment rather than under the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Vallen*, 2016 WL 482026, at *3–4 (same). Plaintiff's rights under the Due Process Clause are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (quoting *City of Revere v. Mass Gen. Hosp.*, 463 U.S. 239, 244 (1983)).[20]

 To state a Due Process claim relating to conditions of confinement, Plaintiff must plausibly allege "both an objective element—that the prison officials' transgression was 'sufficiently serious'—and a [mens rea element]—that the officials acted, or omitted to act, with a 'sufficiently culpable state of mind,' i.e., with 'deliberate indifference to inmate health or

---

[20] Until recently, "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody [were] analyzed under the same standard irrespective of whether they [we]re brought under the Eighth or Fourteenth Amendment." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009), *overruled by Darnell*, 849 F.3d 17. However, the Second Circuit's recent decision in *Darnell*, 849 F.3d 17, overruled *Caiozzo* "to the extent that it determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is under the Eighth Amendment." *Id.* at 35.

safety.'" *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (italics omitted) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).[21]

"To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Thus, prison officials violate the Constitution when they deprive an inmate of his "basic human needs" such as food, clothing, medical care, and safe and sanitary living conditions. *Id.* (internal quotation marks omitted). "[T]here is no static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (internal quotation marks omitted). The Court must consider the "severity and duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30. Moreover, conditions of confinement may be aggregated to rise to the level of a constitutional violation, but "only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (noting that "low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).

For claims specifically alleging deliberate indifference to medical needs, "the alleged deprivation of adequate medical care must be sufficiently serious." *Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (internal quotation marks omitted). Analyzing this objective requirement involves two inquiries: "[t]he first . . . is whether the prisoner was actually deprived of adequate medical care," *Salahuddin*, 467 F.3d at 279, and the

---

[21] In *Darnell*, the Second Circuit indicated that this prong should be referred to the "mens rea prong," rather than the "subjective prong," to prevent confusion. *See Darnell*, 849 F.3d at 29 (italics omitted).

second "asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the [c]ourt to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner," *id.* at 280. "There is no settled, precise metric to guide a court in its estimation of the seriousness of a prisoner's medical condition." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Nevertheless, the Second Circuit has presented the following non-exhaustive list of factors to consider when evaluating an inmate's medical condition: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)); *Morales v. Fischer*, 46 F. Supp. 3d 239, 247 (W.D.N.Y. 2014) (same). Generally, the condition must be "'a condition of urgency' that may result in 'degeneration' or 'extreme pain.'" *Grimmett v. Corizon Med. Assocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at *3 (S.D.N.Y. May 24, 2017) (quoting *Chance*, 143 F.3d at 702).

The second requirement is the mens rea prong. "Prior to the Second Circuit's decision in *Darnell*, 849 F.3d 17, the second element—whether the defendant acted with a sufficiently culpable state of mind—was evaluated subjectively." *Ryan v. Cty. of Nassau*, No. 12-CV-5343, 2018 WL 354684, at *3 (E.D.N.Y. Jan. 10, 2018). However, in *Darnell*, in light of the Supreme Court's decision in *Kingsley v. Henderickson*, 135 S. Ct. 2466 (2015), the Second Circuit held that when a claim arises under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35; *see also Ryan*,

2018 WL 354684, at *3 (same); *Charles v. Cty. of Orange, New York*, No. 16-CV-5527, 2017 WL

4402576, at *10 (S.D.N.Y. Sept. 29, 2017) (same). "In other words, the second element of a

deliberate indifference claim under the Fourteenth Amendment 'is defined objectively,' and a

plaintiff is not required to show subjective awareness by the defendant that '[his] acts (or

omissions) have subjected the pre-trial detainee to a substantial risk of harm.'" *Ryan*, 2018 WL

354684, at *3 (quoting *Darnell*, 849 F.3d at 35).[22] Despite the slightly lower standard articulated

in *Darnell*, which is akin to objective recklessness, "any § 1983 claim for a violation of due

process requires proof of a mens rea greater than mere negligence." *Smith v. Outlaw*, No. 15-

CV-9961, 2017 WL 4417699, at *3 (S.D.N.Y. Sept. 30, 2017) (quoting *Darnell*, 849 F.3d at 36)

(italics omitted); *see also Ryan*, 2018 WL 354684, at *3 (same); *Grimmett*, 2017 WL 2274485, at

*4 (same). A detainee must prove that an official acted intentionally or recklessly, and not

merely negligently. *Darnell*, 849 F.3d at 36.

The Court construes Plaintiff to be alleging due process violations based on three events:

(1) Rollins not allowing Plaintiff to shave and withholding medication; (2) Garcia giving

Plaintiff an "X"; and (3) Dr. Baxi subsequently increasing Plaintiff's medication. The Court will

address each in turn.

---

[22] While *Darnell* involved claims of unconstitutional conditions of confinement, several
courts in the Second Circuit have extended *Darnell*'s holding to claims of deficient medical
treatment. *See, e.g.*, *Ryan*, 2018 WL 354684, at *3 n.1 (extending *Darnell* to claims of deficient
medical treatment); *Grimmett*, 2017 WL 2274485, at *4 n.2 (same); *Smith v. Outlaw*, No. 15-CV-
9961, 2017 WL 4417699, at *3 (S.D.N.Y. Sept. 30, 2017) (same); *see also Charles*, 2017 WL
4402576, at *10 ("This standard for deliberate indifference applies to any underlying violation of
the due process clause, such as for maintaining unconstitutional conditions of confinement or
failing to provide adequate medical care to a person in state custody, 'because deliberate
indifference means the same thing for each type of claim under the Fourteenth Amendment.'")
(quoting *Darnell*, 849 F.3d at 33 n.9.)

### a.  Rollins Denying Plaintiff a Shave and Withholding Medication

Defendants argue that Rollins preventing Plaintiff from shaving on one occasion does not amount to a constitutional violation.  (Defs.' Mem. 15.)  Plaintiff argues Rollins was "malicious" in "refusing Plaintiff a shave even after . . . Armstrong made a directive to give Plaintiff the opportunity to shave."  (Pl.'s Mem. 2.)  The Court finds Plaintiff has failed to satisfy the objective prong, because he has not alleged a deprivation of his "basic human needs" from being denied a shave on one occasion.  *Walker*, 717 F.3d at 125 (internal quotation marks omitted).  While "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation," *id.*, "courts are extremely reluctant to find constitutional violations based on temporary deprivations of personal hygiene and grooming items."  *Myers v. City of New York*, No. 11-CV-8525, 2012 WL 3776707, at *8 (S.D.N.Y. Aug. 29, 2012) (alterations and internal quotation marks omitted), *aff'd,* 529 F. App'x 105 (2d Cir. 2013).  Here, Plaintiff has only alleged a one-time denial of a shave, not a regular deprivation of hygiene articles.  Because Plaintiff has failed to satisfy the objective prong, the Court does not decide whether the mens rea prong was satisfied.  Thus, the Court dismisses this claim.

Plaintiff's claim against Rollins for deprivation of medication also fails because Plaintiff has not alleged any facts suggesting that Rollins did not allow him to take his medicine.  Rather, Plaintiff stated he "refused his medication until he shaved."  (Compl. ¶ 38.)  And, that he "was given his normal medication at around 9:35."  (*Id.* ¶ 43.)  Therefore, the Court also dismisses this claim.

### b.  Garcia Giving Plaintiff an "X"

Defendants argue that Plaintiff's Due Process claim against Garcia should be dismissed because Plaintiff has not alleged a deprivation of any constitutionally protected interest.  (Defs.'

Mem. 15–16.)  Plaintiff argues that "Garcia deprived Plaintiff [of a] liberty interest by giving him an 'X', thus causing Plaintiff to lose his privilege level."  (Pl.'s Mem. 7.)  Plaintiff has a "constitutionally-protected liberty interests in adequate food, shelter, clothing, medical care, and conditions of reasonable care and safety."  *Vallen*, 2016 WL 482026, at *3–4.  Plaintiff has not alleged that the loss of his "privilege level" deprived him of any constitutionally-protected liberty interests.  Nor does Plaintiff allege that this loss of privilege level "pose[d] an unreasonable risk of serious damage to his health."  *Walker*, 717 F.3d at 125 (citing *Rhodes*, 452 U.S. at 347; *Phelps*, 308 F.3d at 185).  Therefore, this claim is dismissed as to all Defendants.

### c.  Dr. Baxi Increasing Plaintiff's Medication

Defendants argue that Plaintiff's disagreement with Dr. Baxi regarding the increase of his medication should be dismissed because it does not rise to the level of a constitutional violation.  (Defs.' Mem. 16–17.)  Plaintiff alleges that the treatment may not have been "the least restrictive method of treatment" and that Dr. Baxi was deliberately indifferent to his medical needs by proscribing a drug with "irreversible brain damages" as a side effect.  (Pl.'s Mem. 9–10.)[23]

---

[23] To the extent Plaintiff seeks to challenge the New York State Court order authorizing changes to Plaintiff's medication over his objection, that claim is barred by the *Rocker-Feldman* doctrine.  *See Capers v. Kirby Forensic Psychiatric Ctr.*, No. 13-CV-6953, 2016 WL 817452, at *3 (S.D.N.Y. Feb. 25, 2016), ("[W]here, as here, a plaintiff challenges a state court judgment authorizing medication over objection, the action is barred by the *Rooker-Feldman* doctrine.");  *Meyers v. Health & Hosp. Corp.,* No. 13-CV-258, 2014 WL 4160796, at *3 (E.D.N.Y. Mar. 28, 2014), *adopted by*, 2014 WL 4161975 (E.D.N.Y. Aug. 19, 2014) (finding *Rooker-Feldman* doctrine barred review of state court order granting defendants' request to involuntarily medicate plaintiff over plaintiff's objections).  The *Rooker-Feldman* doctrine precludes federal district courts from exercising subject matter jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  This doctrine would therefore bar any claim Plaintiff might be bringing here to challenge the legality of the state court order.

Plaintiff's allegations regarding the medication increase are insufficient to state a deliberate indifference claim against any Dr. Baxi or any other Defendant. "Plaintiff's complaints concerning his psychiatric treatment are properly analyzed under the professional judgment standard set forth in *Youngberg*[, 457 U.S. 307], which states that decisions of professionals are presumptively valid and will result in liability 'only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *McNair v. Kirby Forensic Psychiatric Ctr.*, No. 09-CV-6660, 2010 WL 4446772, at *9 (S.D.N.Y. Nov. 5, 2010) (quoting *Youngberg*, 457 U.S. at 320). In approving the treatment of Plaintiff, a New York State Judge determined that the State demonstrated by clear and convincing evidence that "the proposed treatment [was] narrowly tailored to give substantive effect to the patient's liberty interest taking into consideration all relevant circumstances, including the patient's best interests, the benefits to be gained from the treatment, the adverse side effects associated with the treatment and any less intrusive alternative treatments." *Rivers v. Katz*, 495 N.E.2d 337, 344 (N.Y. 1986) (establishing standards for administration of antipsychotic drugs when patient refuses to consent). Thus, Plaintiff has failed to plead a "substantial departure from accepted professional judgment, practice, or standards." *McNair*, 2010 WL 4446772, at *9 (internal quotation marks omitted).

Plaintiff's claims boil down to nothing more than a dispute with Dr. Baxi over the treatment he has received. Yet, such disagreement regarding the particularities of his treatment is insufficient to state a claim. *See Chance,* 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Vallen*, 2016 WL 482026, at *3–4 ("[The p]laintiff's allegations regarding change in medicine dosage "make

clear that while he may have disagreed with the course of treatment, [the d]efendants were not deliberately indifferent to [the p]laintiff's medical needs."); *Nelson v. Deming,* 140 F. Supp. 3d 248, 262 (W.D.N.Y. 2015) (dismissing deliberate indifference claim because the "[p]laintiff's disagreement with th[e] course of treatment does not amount to deliberate indifference by [the] [d]efendants"); *Washington v. Westchester Cty. Dep't of Corr.,* No. 13-CV-5322, 2014 WL 1778410, at *6 (S.D.N.Y. Apr. 25, 2014) ("[I]t is well-settled that the ultimate decision of whether or not to administer a treatment or medication is a medical judgment that, without more, does not amount to deliberate indifference."); *Idowu v. Middleton,* No. 12-CV-1238, 2013 WL 4780042, at *9 (S.D.N.Y. Aug. 5, 2013) ("[The] [p]laintiff's disagreement with [a defendant]'s diagnostic technique and medical judgment cannot provide the basis for a deliberate indifference claim under the Eighth Amendment."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a [§] 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment."). The mere fact that Plaintiff disagrees with the chosen methods of treatment is insufficient to support his Fourteenth Amendment deliberate indifference claim. Therefore, this claim is dismissed as to all Defendants.[24]

### III. Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted. However, because this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice.

---

[24] Because the Court has dismissed all of Plaintiff's claims, the Court declines to address the issue of Defendants' qualified immunity at this time. (Defs.' Mem. 21–23.)

*See Terry v. Inc. Vill. Of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016) (explaining that "district judges should, as a general matter, liberally permit pro se litigants to amend their pleadings" unless "amendment would be futile").

Should Plaintiff choose to file an amended complaint, he must do so within 30 days of this Opinion, addressing the deficiencies identified herein. The new amended complaint will replace, not supplement, the complaint currently before the Court. It therefore must contain *all* of the claims and factual allegations Plaintiff wishes the Court to consider. The Court will not consider factual allegations raised in supplemental declarations, affidavits, or letters. If Plaintiff fails to abide by the 30-day deadline, this Action could be dismissed with prejudice.

The Clerk of the Court is respectfully requested to terminate the pending motion, (Dkt. No. 27), and to mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated: March **30**, 2018
       White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE